Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 01 C 2503 | DATE | 5/28/2002 |
| CASE TITLE | Sam Rossi vs. Glen L. Bower, et. al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendants' Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
      ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum Opinion and Order, Defendants' Motion for Summary Judgment is GRANTED on Count II of the complaint and DENIED on Counts I and III of the complaint [33-1]. All other motions are moot and terminated.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 2 number of notices | Document Number |
|---|---|---|---|---|
| | No notices required. | | | |
| X | Notices mailed by judge's staff. | | MAY 29 2002 date docketed | 45 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 5-28-02 date mailed notice | |
| klb (lc) | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SAM ROSSI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 01 C 2503 |
| v. | ) |
| | ) HONORABLE DAVID H. COAR |
| GLEN BOWER, et al., | ) |
| | ) |
| Defendants. | ) |

**DOCKETED**

**MAY 2 9 2002**

## MEMORANDUM OPINION AND ORDER

Sam Rossi ("Rossi" or "plaintiff") filed a three count complaint in this Court seeking declaratory, injunctive and compensatory relief pursuant to 42 U.S.C. Section 1983 against defendants Glen Bower ("Bower"), Scott Wiseman ("Wiseman"), and Douglas Howard ("Howard") (collectively "defendants"). Rossi alleges that the defendants retaliated against him for exercising his right to free speech and association and freedom to petition the government for redress of grievances pursuant to the First and Fourteenth Amendments to the United States Constitution. Rossi further claims that the defendants invaded his right to privacy protected by the First, Fourth, Fifth, Ninth and Fourteenth Amendments to the United States Constitution. Finally, Rossi seeks damages pursuant to Illinois law for invasion of privacy and intrusion into seclusion. Before this court is defendants' motion for summary judgment on all counts. For the reasons set forth below, defendants' motion for summary judgment is granted on Count II of the complaint and denied on Counts I and III.

I.  **Summary Judgment Standard**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Michael v. St. Joseph County, et. al, 259 F.3d 842, 845 (7th Cir. 2001). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-movant, a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, the non-movant must respond to the motion with evidence setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Michael, 259 F.3d at 845; Albiero v. City of Kankakee, 246 F.3d 927, 932 (7th Cir. 2001). To successfully oppose the motion for summary judgment, the non-movant must do more than raise a "metaphysical doubt" as to the material facts, see Wolf v. Northwest Ind. Symphony Soc'y, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation and quotation omitted), and instead must present definite, competent evidence to rebut the motion, see Albiero, 246 F.3d at 932. Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S. Ct. at 2552-53. A scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a

summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 250, 106 S. Ct. at 2511.

## II. Factual Background

The plaintiff, Sam Rossi, is a Senior Special Agent at the Illinois Department of Revenue ("IDOR" or "the Department"). Rossi investigates criminal cases involving the state tax laws. Rossi has been employed by the Department since 1984. Rossi is also President of Local 2467 of AFSCME (American Federation of State, County, and Municipal Employees). Local 2467 contains about 400 people who hold various positions in the Department. He has been the local union president since 1995. Glen Bower is the Director of the IDOR. He became Director of Revenue in 1999. The Department is responsible for collection of state taxes and enforcement of the state's tax laws. Scott Wiseman was at all relevant times the Chief of Staff to Director Bower at the Department. He is currently Executive Director of the Illinois Commerce Commission. Douglas Howard is the Chief Inspector of the IDOR. In that capacity, he is in charge of the Department's Internal Affairs division, which conducts internal investigations of Department employees accused of misconduct. Howard joined the Department as head of Internal Affairs in July, 1999.

On January 25, 1999, Rossi e-mailed Bower, asking Bower to meet with him and with other Local 2467 officials for one hour on a day when Bower was working in Chicago. The e-mail detailed Rossi's union activities. The e-mail stated in part, "We are looking forward [to] working for you and with you. We would like to have an hour of your time one day in Chicago so we could meet and talk with you about our goals and concerns as a Local." Bower did not respond to Rossi's e-mail, but there was an introductory meeting between the union

-3-

representatives and the Director and other IDOR staff. In February 1999, one of the members in Rossi's Local complained to the Union that a supervisor in the Department was making inappropriate remarks of a sexual nature to her. After the complaint of sexual harassment, the employee complained to the Local that other Department officials were asking questions about her academic background even though she had been employed by the Department for ten years. Late in April 1999, Rossi e-mailed Bower regarding the sexual harassment allegations. The e-mail alleged that the supervisor in question had a history of inappropriate behavior and that the harassment of the employee had increased since she had reported the problem. The e-mail requested that Bower look into the allegations. Bower did not reply to the e-mail, but the charge was investigated.

On June 10, 1999, Rossi sent an e-mail to Bower regarding the building security and evacuation practices at the IDOR offices in the State of Illinois office building at 100 W. Randolph in Chicago. He sent the memo because the State Department of Central Management Services had waited 30 minutes before ordering the evacuation of the building in response to a car being driven into the front of the building. In the e-mail Rossi stated he would contact newspapers and TV stations if IDOR did not take action to upgrade the security procedures for the building. Bower did not respond to the e-mail, but at a union-management meeting in June the Director conveyed the message that matters were not being ignored.

Beginning in 1999, Rossi was the subject of two internal investigations and was interviewed in connection with a third. Rossi was accused in an anonymous letter of running a T-shirt business on state time. An investigation ensued but Rossi was cleared of any wrongdoing and no disciplinary action was taken against him. Rossi was accused of conduct unbecoming an

employee in a swearing incident. Rossi was suspended for three days.[1] In the third case, he was interviewed regarding the fact that certain political fliers were found in the Thompson Center in the Department of Revenue. No disciplinary action was taken against Rossi in connection with that incident.

On May 6, 1999, the IDOR received an anonymous letter alleging that Rossi was engaging in a T-shirt business on official state time. The letter was referred by Director Bower to Internal Affairs. On June 23-24, 1999, Investigator Hoskinson conducted surveillance at Rossi's home in Chicago Heights and did not observe any unusual activities at Rossi's home which would suggest he was operating the T-shirt business on state time.

At some point in late July, 1999, Director Bower made a decision to transfer a number of Revenue Agents to the Illinois Gaming Board to work on the river boats. This would permit Illinois State Police to leave the river boats and be reassigned to traditional police functions. It would also permit the Department to hire more auditors. Rossi, on behalf of the union, opposed this transfer of Revenue Agents. On August 6, 1999, Rossi made a telephone call to Tom Swoik, an official with the Gaming Board. Swoik's secretary, Pam Gorbett, was on the line and heard the conversation. Swoik says Rossi said, "What the fuck are you trying to pull, someone is going to string you up by the balls." Rossi contends he said, "What the fuck's going on ... someone is going string me up by the balls." Swoik reported the call to the Department of Revenue, which conducted an Internal Investigation. Swoik, Gorbett, and Rossi were interviewed. The report concluded that a preponderance of the evidence supported Swoik's version of events. The report

---

[1] Defendants contend that Rossi's suspension was due to his threats and swearing directed at an official with the Gaming Board. Rossi contends his suspension was due to his vigorous representation of the Union members in AFSCME Local 2467.

-5-

went on to state that regardless of which version of events was correct, Rossi was guilty of conduct unbecoming an employee. Rossi was suspended for three days in connection with this incident.

On August 17, 1999, two fliers, along with numerous copies of each were found in the Department of Revenue's offices and break room on the 7th floor of the Thompson Center and Springfield offices of the IDOR. One flier listed the political contributions of Director Bower and the other listed the political contributions of Deputy Director John Roupas. An investigation was initiated to see if office copiers were misused in copying this material. In addition, the investigation focused on whether an IDOR employee used his or her access to the Internet at work to obtain the information in the fliers.

A number of office staff were interviewed about what they knew or saw in connection with the fliers, including the Director's secretary, other secretaries, a security officer, and an administrative assistant. On October 14, 1999, Sam Rossi was also interviewed. Rossi told Internal Investigator Peggy Hoskinson that he did not distribute the fliers and did not know who did. He also stated he did not know if he was in the Thompson Center on August 16 or 17, 1999, without checking his records. Finally, Rossi stated he had access to the Internet at home, but not at work. No disciplinary action was taken against Rossi in connection with the fliers. The interview was the only contact Internal Affairs had with Rossi regarding the incident.

On October 14, 1999, Rossi was also interviewed by Hoskinson in connection with the letter that accused Rossi of engaging in a T-shirt business on official state time. Rossi denied working on his T-shirt business on state time. He also stated that the business, Hot Ink Screen Printing, was owned by his friend, Patricia Skiba. On October 20, 1999, Hoskinson prepared a

report detailing her findings. Howard directed Hoskinson to conduct an additional investigation. Hoskinson then checked Rossi's office telephone and telephone credit card charges. The records did not reveal any calls that were not work related. Rossi's supervisor, Tom Hurley, was interviewed, and stated that he had no knowledge which would suggest Rossi was working on the T-shirt business on state time, and that Rossi's work productivity was good. On March 8, 2000, Howard and Hoskinson submitted a Closing Report on their investigation, which concluded that there was no evidence to support the anonymous allegation. Wiseman concurred and recommended that the investigation be closed.

On March 8, 2000, Rossi and Bower testified before the General Assembly on the transfer of agents. Rossi also wrote an open letter to the legislature protesting the transfer of agents. Thereafter, several state legislators expressed concern and opposition to the proposal to Bower. In addition, the leaders of the Republican Party in Illinois House and Senate wrote letters opposing the proposal to transfer Special Agents.

On April 4, 2000, after reviewing the Closing Report, Director Bower had a meeting with Douglas Howard and Scott Wiseman. Bower raised questions about the completeness of the T-shirt investigation and requested a follow up investigation. Howard prepared an additional memorandum regarding the April 4, 2000 meeting. The investigation was re-started and transferred to investigators who had been recently hired to staff the Chicago office. James Oliver was the lead investigator and was assisted by Carlos Aulet, the other investigator assigned to the Chicago office. Oliver obtained Rossi's credit report, which appeared to indicate that he was carrying a mortgage in excess of $600,000. That amount would have been far beyond his ability to finance solely with legitimate income from his employment with the Department of Revenue.

This led Howard to contact the Illinois State Police, pursuant to the required policy when an agency discovers possible criminal conduct. Later the investigators determined that the credit report was in error, and that the mortgage on Rossi's house was not as large as the credit report indicated.

The Chicago Investigators conducted additional surveillance at Rossi's residence and took photographs of his house and former house. They reviewed the credit report of Patricia Skiba, Rossi's then fiancé. They reviewed the sales tax returns of the T-shirt business. They obtained and reviewed Rossi's divorce decree from court files. They obtained property tax information on Rossi's home and a property he owned. They subpoenaed utility records for his home. They examined motor vehicle records. They examined garbage from Rossi's home. They obtained the direct deposit information on Rossi's bank. They used an undercover operative to attempt to buy T-shirts from Rossi during official business hours. Rossi did not sell T-shirts to the undercover operative. It became clear to the investigators after a closer examination of the credit report in June, 2000, that Rossi was able to meet his legitimate expenses with his legitimate sources of income.

On July 6, 2000, Oliver requested Rossi and Skiba's federal tax returns from the Internal Revenue Service. On July 7, 2000, Hoskinson notified Oliver it would take 4-6 weeks to obtain them. On July 13, 2000, they submitted the final closing report on the T-shirt case which concluded that there was no credible evidence to believe the allegation was true. The federal tax returns were received some time in September, 2000 and were examined by Howard and Oliver. The federal tax returns contained no evidence that would suggest Rossi was earning large amounts in some illegal manner. Rossi was not disciplined for conducting the T-shirt business.

## III. Discussion

Section 1983 provides a remedy--action at law, suit in equity, or other proper proceeding for redress--to parties deprived of constitutional rights, privileges, and immunities by a state official's abuse of his position. 42 U.S.C. § 1983; Monroe v Pape, 365 US 167, 5 L Ed 2d 492, 81 S Ct 473 (1961). Section 1983 basically seeks to (1) deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights, and (2) provide related relief. Richardson v McKnight, 521 US 399, 138 L Ed 2d 540, 117 S Ct 2100 (1997). Section 1983 is not itself a source of substantive rights, but rather a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes. Baker v McCollan, 443 US 137, 61 L Ed 2d 433, 99 S Ct 2689 (1979).

Plaintiff's claim is that he was investigated in the T-shirt case in retaliation for his union activities and because he spoke out in testimony before the General Assembly and in newspapers opposing the transfer of Revenue Agents to the Illinois Gaming Board. As union president, Rossi was concerned about the transfer of union members to locations far from their homes. He also expressed concerns that reducing the number of agents would harm the state's ability to enforce criminally the state's tax laws. The Director's view was that hiring more auditors would actually bring in more delinquent tax revenue than the special agents would. Rossi also claims that his rights were violated in connection with the cursing incident with Tom Swoik, and because he was interviewed about the political fliers found in the Department's Chicago offices.

"It is clearly established that a State may not [retaliate against] an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." Rankin v. McPherson, 483 U.S. 378, 383, 97 L. Ed. 2d 315, 107 S. Ct. 2891 (1987). It is also clearly

established that an individual has a right to engage in union activity which is protected by the freedom of association in the First Amendment. McLaughlin v. Tilendis, 398 F.2d 287 (7th Cir. 1968). To establish a cause of action under Section 1983 for retaliation in violation of the First Amendment, a public employee must demonstrate that he has suffered an adverse employment action motivated by the exercise of his right to free speech or association. Pickering v. Bd. of Educ., 391 U.S. 563, 20 L. Ed. 2d 811, 88 S. Ct. 1731. The speech must be on a matter of public concern. Connick v. Myers, 461 U.S. 138, 147, 75 L. Ed. 2d 708, 103 S. Ct. 1684. The employee's interest in speech must outweigh governmental interests in running an efficient and productive office. Pickering, 391 U.S. at 568; Breuer v. Hart, 909 F.2d 1035, 1037 (7th Cir. 1990). And the complained-of action must be sufficiently adverse to present an actual or potential danger that the speech of employees will be chilled. See Rutan v. Republican Party of Illinois, 497 U.S. 62, 73-74, 111 L. Ed. 2d 52, 110 S. Ct. 2729.

The Court of Appeals in the Seventh Circuit has held that injuries from petty harassment and ridicule are sufficient to sustain a cause of action under Section 1983 if that harassment and ridicule is designed to deter public employees from asserting their First Amendment rights. Bart v. Telford, 677 F.2d 622 (7th Cir. 1982); see also Munoz v. Chicago Sch. Reform Bd. of Trustees, 2000 WL 152138 (N.D. Ill. 2000) (a campaign of threats and harassment stated a cause of action for the chilling of th exercise of First Amendment rights).

Plaintiff was suspended for using vulgar language and threatening Tom Swoik. It is undisputed that a suspension is an adverse employment action. Thus, the issue is whether said action was motivated by Rossi's exercise of free speech or union activities. Swoik is not an employee of the IDOR, he is a manager with the Gaming Board. Swoik specifically complained

-10-

in writing about the incident, was disturbed by it, and thought it was uncalled for. Swoik requested that appropriate disciplinary action be taken against Rossi. The Department investigated the incident and, when interviewed, Swoik stated "he did not personally feel threatened but he could have taken it as a threat if he would not have known Rossi." The Department decided to suspend Rossi for three days. Wiseman conceded that he would have believed the matter less serious had he known that Swoik did not feel threatened. Howard also stated that one of the reasons for the discipline was that he believed Swoik had felt threatened. The plaintiff argues that since Swoik did not feel threatened, one could infer that the suspension was retaliation for union activism. Viewing the evidence in the light most favorable to the plaintiff and resolving all factual inferences in his favor, a reasonable juror could conclude that Rossi's union activism motivated his suspension.

Plaintiff also alleges retaliation for his union activism in that he was questioned in connection with an incident regarding leaflets distributed in the IDOR on or about August 17, 1999. The leaflets listed the political contributions made by the Deputy Director of the Department, John Roupas, to State Republican officeholders and candidates and was critical of Roupas. Bower initiated an investigation to determine the identity of the individuals who composed and distributed the leaflets. Hoskinson handled the investigation and questioned Rossi about the source of the leaflets. The defendants have offered no explanation as to why Rossi was questioned in connection with the incident. In her report, Hoskinson stated that she could not find any information to identify the individual who created and distributed the fliers in question. Plaintiff was not disciplined in connection with the leaflet incident. Mere accusations, without more, are not adverse employment actions. Benningfield v. City of Houston, 157 F.3d 369, 376

(5th Cir. 1998). However, this incident along with the swearing incident and T-shirt investigation permit the inference that Rossi was being targeted.

Rossi's final claim for retaliation involves the T-shirt investigation. It is possible for an investigation to be actionable under Section 1983 if it is initiated to chill the exercise of First Amendment rights. In this case, however, it is clear that the IDOR had an obligation to investigate Rossi's T-shirt business due to the anonymous tip that Rossi was conducting the business on state time. Thus, Rossi's claim of retaliation rests on the length and scope of the investigation. It began with surveillance of Rossi's home in June, 1999. There was no further action until October. In October 1999, Hoskinson interviewed Rossi about the T-shirt business and the swearing incident at the same time. Hoskinson submitted a report finding that there was no evidence of wrongdoing, but Howard requested further investigation. A report was submitted in March and Bower questioned the completeness of the investigation. This was around the time of the General Assembly testimony. The investigation continued and was finally closed in July with a finding of no wrongdoing. The investigation included examination of Rossi's financial records, credit report and tax returns. Viewing the evidence in the light most favorable to Rossi, a reasonable jury could infer that the investigation continued in retaliation for Rossi's Congressional testimony. The fact that Rossi was eventually exonerated of the charges does not destroy the inference that the Department was out to get him, it just shows that they failed.

Defendants argue that they are entitled to qualified immunity. In <u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982), the Supreme Court stated that government officials performing discretionary functions have a qualified immunity from money damages if their actions do not violate clearly established constitutional or statutory rights of which a reasonable person would

have known. Id. at 818. The test is objective, and is intended to shield public officials from discretionary judgments they make unless they violate clearly established constitutional norms. The test is whether the law was clear in relation to the specific facts confronting the official when he acted. Chan v. Wodnicki, 123 F.3d 1005, 1008 (7th Cir. 1997).

Viewing the evidence in the light most favorable to the plaintiff, the defendants would not be afforded qualified immunity. The law is clearly-established that a State may not [retaliate against] an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." Rankin v. McPherson, 483 U.S. 378, 383, 97 L. Ed. 2d 315, 107 S. Ct. 2891 (1987). There is a strong public interest in ferreting out misconduct by police officers. Shields v. Burge, 874 F.2d 1201, 1204 (7th Cir. 1988). However, if the actions of the defendants were motivated by Rossi's union activism and First Amendment speech, defendants would be liable for damages. Accordingly, it would be improper for this Court to grant summary judgment to the defendants on qualified immunity grounds. Summary judgment is denied on Count I of the complaint. The factual issue of what motivated defendants' actions is a matter for the jury to determine.

Count II of Rossi's complaint alleges that his privacy rights were violated by the Department's investigation into his personal and financial affairs. The right of privacy contained in the U.S. Constitution protects against the disclosure of personal information. Whalen v. Roe, 429 U.S. 589 (1977); Roach v. City of Evansville, 111 F.3d 544, 550 (7th Cir. 1997). Defendants argue that they should be afforded qualified immunity because it was not clearly established at the time of their investigation that personal financial information was protected by the right to privacy. In Denius v. Dunlap, a teacher at a state-run, military-style high school was required to

sign a release permitting disclosure of personal financial information as a condition of employment. 209 F.3d 944 (7th Cir. 2000). There was no limitations in the authorization against further disclosure or misuse. Nor was there a legitimate government justification advanced in favor of the disclosure. The Seventh Circuit concluded that some types of financial information are entitled to a measure of constitutional protection, but did not specify which types, because the defendant was shielded by qualified immunity. Id. at 957-58. The Seventh Circuit determined that at the time Denius was asked to sign the waiver the law was not clearly defined.

The Denius case was decided on April 11, 2000, after Bower re-opened the T-shirt investigation on April 4, 2000. Bower could not have been expected to anticipate the ruling in Denius. The Seventh Circuit itself stated that there was a trend among the majority of circuits but the conclusion was not unanimous. The investigation was concluded and Rossi was exonerated of any wrongdoing on July 13, 2000, just three months after the Denius decision. The federal tax returns, ordered on July 6, 2000, arrived in September, 2000 after the investigation was concluded. Even if Bower were charged with knowledge of the Denius case immediately after it was decided, it is still not clear that the Department's investigation was unconstitutional. The contours of the right are not sufficiently clear such that a reasonable official would understand that what he is doing violates that right. See Anderson, 483 U.S. at 640. In Denius, the court was concerned with the lack of justification for obtaining the information. In this case the justification is clear - the Department has a strong interest in the integrity of its law enforcement officers. See National Treasury Employees Union v. Von Raab, 489 U.S. 652 (1989). The Department received an anonymous letter alleging misfeasance. The investigation was focused on determining whether there were high, unreported sources of income. Thus, the

Department reasonably believed that it needed to examine Rossi's financial history. In this case, the defendants are shielded by qualified immunity for Rossi's damages claims. Thus summary judgment is granted on Count II of the complaint.

Rossi also asserts a claim for declaratory and injunctive relief. Qualified immunity does not shield defendants from those types of relief. See Canedy v. Boardman, 91 F.3d 30, 33 (7th Cir. 1996). Defendants argue, however, that Plaintiff lacks standing to seek injunctive relief. In order to obtain prospective injunctive relief, a plaintiff must meet Article III standing requirements, meaning that he must show "a significant likelihood and immediacy of sustaining some direct injury." Sierakowski v. Ryan, 223 F.3d 440, 443 (7th Cir. 2000). Past exposure to an allegedly illegal practice is not sufficient to establish a live case or controversy without showing that the conduct will recur. See Perry v. Sheahan, 222 F.3d 309, 313-15 (7th Cir. 2000).

In City of Los Angeles v. Lyons, 461 U.S. 95 (1983), plaintiff alleged that his constitutional rights were violated when he was subjected to a choke hold when he was arrested. Plaintiff sought damages and an injunction. The Court held that there was nothing in the record to suggest that Lyons would again be arrested or subjected to a choke hold. His allegation that the police "routinely" employ choke holds was found by the Court to "fall far short" of what was necessary to establish a case or controversy. Id. at 104.

In this case, plaintiff is still employed at the Department and active in the union. The exact same triggering events which led to the alleged violation of his rights may not occur again - another anonymous letter will come in, or that plaintiff will be interviewed regarding fliers circulating in the office, or that he will again be disciplined for cursing at or threatening someone. As this Court has explained, the record allows the inference that Rossi was targeted

-15-

for his union activism or First Amendment speech. Thus, there is a real need to lessen the standing requirements in order to safeguard his rights of association and expression. See Briggs v. Ohio Elections Commission, 61 F.3d 487, 492 (6th Cir. 1995).

In Count III, Rossi alleges that the defendants' conduct violated his right to privacy under Illinois law. This Court must apply the same state law immunities that a state court would in deciding the claim. See Benning v. Board of Regents, 928 F.2d 775, 779 (7th Cir. 1991). Defendants argue that Rossi's privacy claim is barred by the doctrine of public official immunity. See Morton v. Hartigan, 145 Ill.App.3d 417 (Ill. App. Ct. 1986) (absolute immunity afforded Attorney General for claim of invasion of privacy in workplace search). The public official immunity, however, "is conditioned upon a good faith exercise of discretion and does not include acts based upon corrupt or malicious motives." Falk v. Martzel, 210 Ill.App.3d 557, 562 (Ill. App. Ct. 1991). The defendants were performing discretionary governmental duties but there is an allegation and evidence from which a jury could conclude that their discretion was not exercised in good faith. Accordingly, defendants' motion to dismiss Count III of the complaint is denied.

**Conclusion**

For the foregoing reasons, the defendants' motion for summary judgment is GRANTED on Count II of the complaint and DENIED on Counts I and III of the complaint.

Enter:

David H. Coar
United States District Judge

Dated: May 28, 2002